FILED

2024 Apr-09  PM 02:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ALABAMA
2    WESTERN DIVISION

3    UNITED STATES OF AMERICA,     | CASE NO. 7:24-cr-00078-ACA-JHE-1
                                    |
4              Plaintiff,          |
                                    |
5    v.                            |
                                    |
6    SEBASTIAN JAQUE BROWN,         |
                                    |
7              Defendant.          |

8                    *   *   *   *   *   *   *   *   *

9              **TRANSCRIPT OF PRETRIAL DETENTION HEARING**

10                   *   *   *   *   *   *   *   *   *

11

12   FOR THE PLAINTIFF:      William Reed McComb, I
                             UNITED STATES ATTORNEY'S OFFICE
13                           1801 Fourth Avenue North
                             Birmingham, Alabama 35203
14
     FOR THE DEFENDANT:      Robin P. Robertson
15                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                             505 20th Street North
16                           Suite 1425
                             Birmingham, Alabama 35203
17
     PROBATION OFFICER:      Jonathan Eubanks
18

19        BEFORE THE HONORABLE NICHOLAS A. DANELLA, UNITED STATES

20   MAGISTRATE JUDGE, at Birmingham, Alabama, on Monday, March 11,

21   2024, commencing at 10:13 a.m.

22

     The proceedings were reported by a stenographic court reporter.
23   The transcript was produced using computer-aided transcription.

24                   **Transcript prepared by:**
                     Pamela G. Weyant, RDR, CRR, CCR
25                      Official Court Reporter

I N D E X

EXAMINATION

FOR THE PLAINTIFF:                                        PAGE

OFFICER JARED OLVEY
     Direct Examination by Mr. McComb                      21
     Cross-Examination by Ms. Robinson                     34
     Redirect Examination by Mr. McComb                    50
     Recross-Examination by Ms. Robinson                   52

FOR THE DEFENDANT:                                        PAGE

SH'NORA DAVIS
     Direct Examination by Ms. Robinson                     8
     Cross-Examination by Mr. McComb                       14

1          (Proceedings commenced at 10:13 a.m. in open court.)

2          THE COURT:  This is 24-cr-78, United States versus

3  Brown.

4          Mr. Brown, good morning.

5          THE DEFENDANT:  Good morning, sir.

6          THE COURT:  Mr. Brown, we're here today on the

7  Government's motion for pretrial detention.  In this hearing

8  it's my job to determine whether there are conditions of

9  release that will reasonably assure your appearance and the

10  safety of the community.  You have the right to counsel today,

11  and you are here with Miss Robin Robertson from the FPD's

12  office.

13         MS. ROBERTSON:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         The Government is represented by Mr. Will McCombs

16  [sic].

17         MR. MCCOMB:  Good morning, Your Honor.

18         THE COURT:  Mr. McCombs, I have this as a presumption

19  case; correct?

20         MR. MCCOMB:  Yes, Your Honor.  As a result of Count 2

21  of the indictment, there is a rebuttal presumption that the

22  defendant is both a danger to the community and a flight risk.

23         THE COURT:  Right.  Assume with me for the moment that

24  the defendant rebuts the presumption.  Would you be seeking

25  detention based on flight risk or danger?

1          MR. MCCOMB:  Danger, Your Honor.  Well, actually,

2    under both, but I think danger is the more pertinent one.

3          THE COURT:  Thank you.  And you agree with me that the

4    burden of proof on danger is clear and convincing evidence?

5          MR. MCCOMB:  Yes, Your Honor.

6          THE COURT:  Flight would be preponderance?

7          MR. MCCOMB:  Yes, Your Honor.

8          THE COURT:  Thank you.

9          Miss Robertson, do you agree with all that?

10         MS. ROBERTSON:  Yes, Your Honor.

11         THE COURT:  And given the presumption, you're up,

12   unless there's anything else that you want to talk about

13   up-front.

14         MS. ROBERTSON:  No, Your Honor.  We have proposed two

15   third-party custodians, and based on the probation office's

16   report that we received this morning, we would be proposing

17   Mr. Brown's sister, Sh'Nora Davis, as a third-party custodian.

18   I'm happy to call her at this time.

19         Your Honor, first, however, I just would like to put

20   on the record a couple of things of note.  Your Honor, just to

21   make sure the Court is aware, under the pretrial services

22   report, I would highlight that the allegations contained under

23   criminal history largely stem from the same conduct that has

24   given rise to the federal charges, so just to make sure that

25   that doesn't appear to be additional criminal conduct.

1         And, Your Honor, I'd like to just give the Court a

2    little bit of history about this case.  This case has actually

3    been with my office since January.  Mr. Brown was initially

4    approached via a target letter my office was appointed to

5    assist at that point.

6         At that juncture, Your Honor, I asked the Government

7    for some preliminary discovery, anything that they could

8    provide to me to add color to the charges and the allegations.

9    I was told that there was nothing available to provide to me

10   at that time.

11        I also asked how best to reach Mr. Brown and was told

12   that they had had difficulty tracking him down, and so it fell

13   upon my office, Your Honor, to locate Mr. Brown and to try to

14   color in some of the allegations of what occurred here.  We

15   were able to identify and locate Mr. Brown with very little

16   difficulty.  I reached out.  We set up a meeting.  Mr. Brown

17   and I sat down at the Tuscaloosa County Library and had a

18   couple of hours to sit and discuss the case.  But again, Your

19   Honor, at that point we had very little in the way of facts

20   and allegations underlying the charge, although I did

21   understand from the Government that the case involved firearms

22   which were alleged to have been equipped with switches, as

23   well as an allegation about an amount of marijuana that would

24   support a drug-trafficking charge.

25        So I did have the opportunity to advise Mr. Brown

1    about potential charges that could be placed upon him,

2    potential sentencing, including mandatory minimum sentences of

3    up to 30 years that could go along with those charges.

4         So after that meeting, Your Honor, I then had an

5    opportunity, accompanied by Mr. Taggart, an investigator with

6    my office, to go visit Mr. Brown at his mother's residence,

7    and we were able to spend some time again, maybe an hour or

8    two with him, at his mother's residence.  But again, we still

9    were lacking in discovery from the Government.  And based on

10   some information that was provided to us and that our

11   investigation revealed, we had some questions about the

12   legality of the search and whether it was conducted in

13   compliance with constitutional requirements.

14        Your Honor, to be frank, the indictment of Mr. Brown

15   came out of thin air for me.  Admittedly, we were working with

16   the resources that we had, to include trying to work with his

17   local counsel in Tuscaloosa.  I had reached out to that

18   individual, hoping that I might be able to get some semblance

19   of discovery.  Unfortunately, that individual had left the

20   Tuscaloosa County Public Defender's Office, and so it took

21   some time before I heard back from a supervising attorney

22   there, who advised me that she had left and that they did not

23   have additional information to provide to us.

24        And, so, in my experience, Your Honor -- and the

25   Government is free to indict individuals at any time.  I'm

1　certainly aware of that.  But in my experience, when I've had

2　target letters, Your Honor, there's usually -- if there's a

3　time sensitivity, I'm usually told there is a time sensitivity

4　and I try to meet those expectations.  Otherwise, Your Honor,

5　I do my due diligence to get into a position where I feel

6　comfortable advising my client and then returning to the

7　Government to explore additional negotiations.  Here, the

8　Government -- thank you -- the Government reached out to me

9　early last week to advise me that they were no longer viewing

10　Mr. Brown as a target and intended to indict him.  And so his

11　arrest just a day or two thereafter was quite surprising to

12　me.

13　　　　What I can say to the Court is that at no point in

14　time did I have any difficulty locating with [sic] or meeting

15　with Mr. Brown.  He has been aware of the severity of

16　potential charges since January.  He was arrested at his

17　mother's home first thing in the morning.  And so, Your Honor,

18　this is not a situation of an individual that, from my

19　perspective, has been trying to avoid consequences.  He's

20　someone that was dutifully working through counsel that was

21　appointed to him.

22　　　　And, Your Honor, I was quite surprised not only that

23　he was -- that the case was proceeded on in that way, but

24　again, defer to the Government at their discretion, but I do

25　think that Mr. Brown, if he had wanted to flee, if he had

1   wanted to do something ill-advised in terms of danger to the

2   community, he has been aware of these potential allegations

3   for going on, I think, two months.  He's had state charges

4   pending related to the same conduct, and again, he was

5   arrested at his mother's home without incident last week

6   shortly after the indictment was returned.

7          So, Your Honor, at this point we would call Sh'Nora

8   Davis to testify regarding potentially serving as Mr. Brown's

9   third-party custodian.

10         THE COURT:  Come on up, ma'am.

11         (SH'NORA DAVIS, being first duly sworn, was examined

12   and testified as follows:)

13         THE COURTROOM DEPUTY:  Will you please sit and state

14   your name and spell your name into the microphone for the

15   record.

16         THE DEFENDANT:  Sh'Nora Davis, S-H apostrophe N-O-R-A

17   Davis.

18         THE COURTROOM DEPUTY:  Thank you.

19         THE COURT:  Good morning.

20         THE DEFENDANT:  Good morning.

21                        DIRECT EXAMINATION

22   BY MS. ROBINSON:

23     Q.  Good morning, Miss Davis.

24     A.  Good morning.

25     Q.  Miss Davis, how do you know Sebastian Brown?

1    A.  That's my baby brother.

2    Q.  Baby brother.  Do you mind if I ask you how old you

3  are?

4    A.  32.

5    Q.  And how old is your brother?

6    A.  19.

7    Q.  19.  Okay.  So sister but quite a few years older.

8    A.  Mama.

9    Q.  Substitute.  I get that.

10        Are you -- I know you've just sat through this initial

11  conversation, but I just want to make sure, are you aware that

12  your brother has been harge with federal crimes?

13    A.  Yes, ma'am.

14    Q.  And are you aware that those crimes include

15  allegations that he was in possession of firearms?

16    A.  Yes.

17    Q.  And I -- thank you.  I'll just ask that you respond

18  out loud because we have a court reporter here who's trying to

19  take down everything that's said.

20        And that those allegations involve marijuana as well?

21    A.  Yes, ma'am.

22    Q.  Where do you reside?

23    A.  In Madison, Alabama.

24    Q.  Is it an apartment or a house?

25    A.  An apartment.

1    Q.   Okay.  Do you lease or do you own?

2    A.   Lease.

3    Q.   Okay.  How long have you been at this address?

4    A.   I've been at this address for about three months, but

5    altogether, Madison County, five years.

6    Q.   Five years in Madison County?

7    A.   Uh-huh.

8    Q.   Okay.  And what do you do for work?

9    A.   I'm a lead front desk associate at -- for Hilton.

10   Q.   So for a hotel?

11   A.   Uh-huh.

12   Q.   So -- and you said you're the lead front desk

13   associate?

14   A.   Uh-huh.

15   Q.   And what are your working hours?  Do you have the same

16   schedule every week?

17   A.   Yes, ma'am, 7 a.m. to 3 p.m. Monday through Friday.

18   Q.   Monday through Friday.  Okay.  And can you describe

19   the apartment, how many bedrooms, how many bathrooms?

20   A.   My apartment is upstairs, two bedrooms, two bath.

21   Q.   And does anyone live there with you?

22   A.   No, ma'am.

23   Q.   Do you have any firearms at the residence?

24   A.   No, ma'am.

25   Q.   Do you allow firearms into the residence?

1    A.   No, ma'am.

2    Q.   Do you have any drugs at the residence?

3    A.   No, ma'am.

4    Q.   Do you allow drugs into the residence?

5    A.   No, ma'am.

6    Q.   Okay.  And would you be willing -- if the Court were

7    to allow your brother to be released on bond, would you let

8    him live with you at the apartment?

9    A.   Most definitely.

10   Q.   Okay.  I know that there was -- and you and I have

11   discussed this -- that there is the potential of needing to

12   get him added to your lease.

13   A.   Uh-huh.

14   Q.   If the Court were to release him on bond -- were to be

15   willing to release him on bond to live with you, would you be

16   able to have a conversation with your leasing office --

17   A.   Yes, ma'am.

18   Q.   -- and ask them to add him to your lease?

19   A.   Yes, ma'am.

20   Q.   And do you anticipate any difficulty in getting him

21   added to your lease?

22   A.   No, ma'am.

23   Q.   Okay.  Miss Davis, do you have any criminal history

24   yourself?

25   A.   No, ma'am.

1    Q.   Okay.  And you said that you're employed full-time?

2    A.   Yes, ma'am.

3    Q.   How long have you been working for the Hilton?

4    A.   For over a year.

5    Q.   Over a year.  What did you do before that?

6    A.   I opened up Mazda Toyota Manufacturing Company.

7    Q.   Okay.  So gainfully employed for --

8    A.   Yeah, I was there for four years.

9    Q.   Okay.  Very good.

10        Now, if the Court were to ask you to serve as a

11   third-party custodian, would you be willing to act in that

12   responsibility at the Court's request?

13   A.   Most definitely.

14   Q.   And do you understand that that would mean having full

15   awareness of any condition the Court put in place that your

16   brother would have to follow?

17   A.   Yep.

18   Q.   And then if you found out or you had any suspicion

19   that your brother had broken any of those rules, would you be

20   willing to notify the Court?

21   A.   Most definitely.

22   Q.   Any hesitation --

23   A.   Oh, no.

24   Q.   Any problem telling on your brother?

25   A.   No, ma'am.

1    Q.   Okay.  And is your brother -- just in your experience,

2    has he been generally respectful and followed any rules that

3    you've given him in the past?

4    A.   Yes, ma'am.  In fact, he was waiting on his court date

5    for this stuff because I had talked to -- reached out to a

6    couple colleagues of mine about him actually getting

7    opportunity -- employment opportunities and stuff up there

8    already.

9    Q.   Okay.

10   A.   Yes, ma'am.

11   Q.   So if the Court were to allow him to work, you would

12   be able to help him --

13   A.   Yes, ma'am.

14   Q.   -- get a job?

15        And then regarding your work schedule, I know you were

16   able to come today --

17   A.   Uh-huh.

18   Q.   If your brother had additional court dates in

19   Birmingham or in Tuscaloosa, would you be able to escort him

20   to those hearings?

21   A.   Yes, ma'am.

22   Q.   And be able to get that time off work?

23   A.   Yes, ma'am.

24   Q.   Okay.  And if he were ultimately sentenced to serve a

25   sentence, would you be able to get him to the facility to

1  serve that time?

2      A.  Yes, ma'am.

3          MS. ROBERTSON:  Your Honor, that's all the questions I

4  have for now.  Thank you.

5          THE COURT:  Thank you.

6          Mr. McCombs?

7          MR. MCCOMB:  Thank you, Your Honor.

8                       CROSS-EXAMINATION

9  BY MR. MCCOMB:

10     Q.  Good morning, Miss Davis.

11     A.  Good morning.

12     Q.  And I've just got a few follow-up questions to that.

13         And I missed -- I did not hear, what were your working

14  hours?

15     A.  7 a.m. to 3 p.m.

16     Q.  And how long have you lived outside of the home or

17  outside of the home Mr. Brown's lived in?

18     A.  For about nine years -- eight, nine years.

19     Q.  Eight or nine years?

20     A.  Uh-huh.  But I'm pretty much home every other weekend,

21  every weekend.

22     Q.  Okay.  Home in Tuscaloosa?

23     A.  Uh-huh.

24     Q.  You indicated that he would need to be added to your

25  lease.

1     A.   Uh-huh.

2     Q.   What -- do you have any idea what goes into adding

3  someone to a -- to your lease for your apartment complex?

4     A.   So I briefly called this morning.  I tried to speak

5  with someone.  The actual property manager wasn't available,

6  but I did talk to an assistant and she said they do it by a

7  case-by-case basis.

8     Q.   Okay.  Did they indicate anything about a background

9  check or anything like that?

10    A.   Oh, no, ma'am [sic].  The girl was fairly new as well.

11         MR. MCCOMB:  Your Honor, may we approach with a

12  quick --

13         THE COURT:  You may.

14         Off the record.

15         (Discussion off the record.)

16         THE COURT:  Back on the record.

17    Q.   (By Mr. McComb)  And without going too deep into

18  anything, Miss Davis, are you aware of any prior criminal

19  activity or criminal conduct that your brother has been

20  involved with in recent years?

21    A.   Yes, sir.

22    Q.   Okay.  And again, without going too much into it, can

23  you tell us roughly the dates that this criminal activity that

24  you're aware of occurred?

25    A.   It depends on how far you're talking back.

1      Q.   Okay.

2           MS. ROBERTSON:  Your Honor, I would ask that the

3     Government limit its question to matters that have been

4     resolved by a judicial body.  Does that make sense?

5           THE COURT:  I think that's fair given the

6     off-the-record discussion.

7           MR. MCCOMB:  That's right.

8      Q.   (By Mr. McComb)  What about the criminal activity that

9     had been resolved by some type of adjudication?  Without going

10    too deep into what that is, are you aware of that and when it

11    occurred?

12     A.   Yes.  My brother, I think he did time for a time,

13    seven months for something, and --

14          MR. MCCOMB:  Okay.  I have no further questions at

15    this time, Your Honor.

16          THE COURT:  Thank you.

17          Miss Robertson?

18          MS. ROBERTSON:  Nothing further, Your Honor.

19          THE COURT:  Thank you.

20          THE WITNESS:  Thank you.

21          THE COURT:  You can step down.  Thanks for being here.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Miss Robertson, what's next?

24          MS. ROBERTSON:  Your Honor, we would just note for the

25    Court that, first off, I believe -- and I think the probation

1    office indicated that Miss Davis would be a suitable

2    third-party custodian.  Obviously, we would need to resolve

3    the matter of the lease, and so we'd not be asking for the

4    Court to release her until the Court received confirmation

5    that he was permitted to reside at that residence.

6         Your Honor, I believe that we've rebutted any concern

7    about flight risk given the fact that Mr. Brown has been aware

8    of these potential charges and potential penalties that could

9    go along with them for a couple months and has made no effort

10   to flee the jurisdiction and was fully compliant with his

11   arrest the other day and has been fully compliant and

12   cooperative with my office in trying to investigate and best

13   advise him.

14        Your Honor, we would ask the Court -- I know that

15   Miss Davis works, and we wouldn't be asking her to discontinue

16   working, but if the Court would release him to her residence,

17   we would ask the Court to also impose location monitoring

18   however the Government -- excuse me -- however the probation

19   office saw fit to make sure Mr. Brown was at the location and

20   would be amenable to a 24/7 restriction to the residence

21   unless and until -- if the Court were to allow Mr. Brown to

22   work, then he would be allowed to leave for work and obviously

23   court, legal meetings, other necessities.

24        But while I do acknowledge that he has these charges,

25   I know that there's been some mention of juvenile history that

1   occurred over five years ago is my understanding.  The -- he

2   has no adult convictions.  The allegations that are listed out

3   in the pretrial services report largely relate to the charged

4   allegations that we're here for, and Mr. Brown would be

5   subject, in terms of his use of marijuana that he's admitted

6   to -- he would be subject to mandatory drug testing and,

7   obviously, searches by probation to confirm no firearms and no

8   other threats while he's residing with his sister.

9         Also, if he is living in Madison County, Your Honor,

10  that's going to remove him some distance from where these

11  allegations are alleged to have occurred.  But, Your Honor,

12  given his age, his relatively minimal criminal history, his

13  full cooperation and compliance with my office for the last

14  two months, and the suitability of his sister as a third-party

15  custodian, we would ask the Court to release Mr. Brown under

16  those conditions.

17        THE COURT:  Let me say a few things.  I am going to

18  hear from the Government, so let's assume for now that we're

19  moving past the presumption.  Miss Robertson, I'm not going to

20  get into a lot of what you mentioned up-front, though I hear

21  what you're saying.  You make a lot of good points.  I don't

22  think -- well, I won't speak for Mr. McCombs.  I agree with

23  you, I don't see risk of flight.  And just so we're all on the

24  same page, the Government's -- excuse me -- the probation

25  office's PTSR recommended detention, I agree with what you

1    said, the third-party custodian memo says Miss Davis is

2    suitable, and everything she said today I think makes her

3    suitable.  But my understanding -- and Officer Eubanks is

4    here -- is that probation still is recommending detention.

5         MS. ROBERTSON:  So, Your Honor, if I made any

6    indication otherwise, I was just speaking --

7         THE COURT:  No, that's not to correct anything you

8    were saying.  That's just, again, to ensure we're all on the

9    same page.  And you can get to this now or later, but I have

10   from the PTSR that Mr. Brown graduated from Northridge in

11   2023, so that's May or June, and then I take your very good

12   point that, really, the state charges line up with the

13   federally charged conduct.  That's November of 2023.  And so

14   far as I can tell here, not been in trouble since, has been

15   cooperating with you since January.  I think Mr. Brown has not

16   been working; is that right?

17        MS. ROBERTSON:  That's my understanding, Your Honor,

18   but --

19        THE COURT:  And so answer this now or later or not at

20   all.  What has he been doing?

21        MS. ROBERTSON:  Your Honor, my understanding is he's

22   been living with his mother.  I cannot speak to -- you know,

23   he just graduated from high school, and I do commend him for

24   that, Your Honor.  Particularly, he spent seven months in

25   custody.  The fact that he was able to get the train back on

1   the tracks and graduate from high school in 2023 I think is

2   quite commendable.  I've certainly represented a number of

3   clients where that has been a fully derailing incident,

4   particularly at that young of a age.  So the fact that he

5   graduated, Your Honor, I think is commendable.

6           He only -- he graduated less than a year ago, so

7   there's only been so much time that he has been employable.  I

8   think that he is probably indebted to his very generous mother

9   and family for sheltering and feeding him for a period of

10  time.  But as his sister said, Your Honor, she's already

11  looked into potential employment opportunities for Mr. Brown.

12  Obviously, I think that would be --

13          THE COURT:  Right.

14          MS. ROBERTSON:  -- to his benefit to have the

15  opportunity to pursue gainful employment if this Court would

16  release him.  And I think he's amenable to pursuing those

17  opportunities that his sister has identified.

18          THE COURT:  Mr. McCombs, you're up.

19          MR. MCCOMB:  Yes, Your Honor.  As far as an argument,

20  or would you like me to go ahead and put the witness on?

21          THE COURT:  I think if you're going to put on

22  evidence, let's do that first unless there is anything you

23  want to respond to directly at this point.

24          MR. MCCOMB:  No.  I'll just go ahead and put evidence

25  on.

1           The Government calls Jared Olvey to the stand.

2           THE COURT:  Come on up, sir.

3           (OFFICER JARED OLVEY, being first duly sworn, was

4    examined and testified as follows:)

5           THE COURTROOM DEPUTY:  All right.  You may be seated.

6    And please state and spell your name into the microphone for

7    the record.

8           THE WITNESS:  It's Jared Olvey, J-A-R-E-D O-L-V-E-Y.

9           THE COURT:  Good morning.

10          THE WITNESS:  Good morning.

11          THE COURT:  It's not a great setup.  Just do your best

12   to talk into the microphone and face out.

13          MR. MCCOMB:  Thank you, Judge.

14                      DIRECT EXAMINATION

15   BY MR. MCCOMB:

16      Q.  Tell us where you work, Mr. Olvey.

17      A.  Work for the Tuscaloosa Police Department, assigned as

18   a task force officer with the ATF.

19      Q.  And how long have you been with the Tuscaloosa Police

20   Department?

21      A.  A little over 19 years.

22      Q.  And how long have you been a task force officer with

23   ATF?

24      A.  A little over six years, I believe.

25      Q.  And your duties as a task force officer with the ATF,

1     what are your duties, actually?

2          A.   Investigate gun crime, violent crime, some narcotics

3     investigations.

4          Q.   Okay.  And are you one of the agents responsible or

5     the lead agent responsible in the case regarding

6     Sebastian Brown?

7          A.   Yes, sir.

8          Q.   Okay.  Can you tell us a little bit about how that

9     case came about?

10         A.   Yes, sir.  We received information through more than

11    one source about Mr. Brown possibly being in possession of

12    Glock switches or machine gun conversion devices.  Through

13    that, we conducted some surveillance at his residence on

14    Northeast Green Grove Drive in Tuscaloosa.  We observed a

15    young man walking from a nearby house with a firearm in his

16    waistband walk down towards Mr. Brown's house and made contact

17    with Mr. Brown on the front porch.  At that time, we went down

18    to the residence down the hill to further our investigation

19    and speak with Mr. Brown and the -- what turned out to be a

20    juvenile and anybody else that may have been at the residence.

21         Q.   Okay.  And I want to back up just a little bit.  You

22    mentioned Glock switches and machine gun conversion devices.

23    Can you elaborate on that just for the record as to what that

24    is or what those are?

25         A.   Yes, sir.  It's a -- it's just a small device you can

1   attach to a Glock -- a Glock pistol that converts it to firing

2   a fully automatic mode versus a single-shot semiautomatic

3   mode.

4   Q.   And would possessing such a device -- would that be

5   outlawed without some further license?

6   A.   Yes.

7   Q.   Now, you indicated that there was a juvenile that you

8   saw approaching Mr. Brown's house with a gun in his waistband.

9   You also indicated he made contact with Mr. Brown?

10   A.   Yes.

11   Q.   Did you see this?

12   A.   I did not, no.

13   Q.   Did some of your ATF agents -- did they witness this

14   contact between the two?

15   A.   Yes, sir.

16   Q.   And you indicated that after they made contact -- did

17   they go inside the home?  What did they do?

18   A.   Yes, sir, they went inside the residence.

19   Q.   Okay.  And is that when you and the other ATF

20   personnel went to the home?

21   A.   Yes, sir.

22   Q.   Okay.  Can you tell us a little bit about when you-all

23   went to the home?  What did each of you do, if you can recall?

24   A.   Agent Brantley, with the ATF, approached from the

25   carport -- or approached the carport.  There was a female in

1    the driveway area.  He made contact with her, began speaking

2    with her around the carport area.  There was a strong odor of

3    burning marijuana in the area.  Myself and two ATF agents went

4    to the west side of the house to observe the back yard based

5    off of a previous incident that I was made aware of at the

6    residence involving Mr. Brown.

7        Q.   What was that previous incident you were made aware of

8    and how were you made aware of it?

9        A.   I was made aware of it through our conversation with

10   one of the violent crimes investigators in Tuscaloosa.  They

11   had gone to the same residence on October 18th, a couple of

12   weeks -- two or three weeks before, to speak to Mr. Brown.

13   They believed him to be a witness in a shooting investigation

14   that they were working on.  When they went to the residence,

15   Mr. Brown attempted to run out the back door, actually ran out

16   the back door carrying an AR-style weapon.  They made contact

17   with him in the back yard, repeatedly told him to put the gun

18   down.  Eventually he did.  He complied and he was detained.

19        That firearm turned out to be involved in an

20   investigation that I had worked approximately a year before.

21   It was a straw purchase, or lying and buying investigation.  A

22   firearm was part of that investigation.  It just hadn't been

23   recovered.  And that's when I was made aware of it.  The

24   violent crime investigator contacted me and told me what had

25   gone on and about the recovery of the firearm.  So based off

1    that, that's what made us want to watch the back yard as we

2    approached the residence because of his tendency to run out

3    the back door.

4        Q.   Okay.  Well, let me stop you there, though.  I just

5    want to be clear.  In that situation that you were made aware

6    of, I guess, was that by other Tuscaloosa Police Department

7    officials?

8        A.   Made aware of that -- the incident?

9        Q.   Yeah.  Who -- was it other Tuscaloosa Police

10   Department officials that told you about the October incident

11   or was it other ATF officials that told you?

12       A.   It was one of the Tuscaloosa violent crimes

13   investigators.  They're headquartered at the Tuscaloosa County

14   Sheriff's Office.

15       Q.   Okay.  And just so the Court's aware, was Mr. Brown --

16   do you have any knowledge as to whether he was actually

17   arrested on that particular day?

18       A.   I'm not aware if he was arrested or not.

19       Q.   Okay.  So just detained and the firearm was recovered?

20       A.   Yes.

21       Q.   Okay.  Now, as a result of that knowledge, you

22   indicated that on this particular occasion -- and let me be

23   clear, this is November 7th --

24       A.   Yes.

25       Q.   -- 2023?

1    A.   Yes.

2    Q.   In November, you and several agents are moving towards

3    the back yard and in anticipation of Mr. Brown possibly

4    running again?

5    A.   Yes, sir, just based off the information of him having

6    run two or three weeks before, whenever law enforcement had

7    arrived to speak with him.

8    Q.   Okay.  So when y'all get to the back yard, what, if

9    anything, did you-all see?

10   A.   We didn't quite make it to the back yard.  There was a

11   fence.  One of the agents observed Mr. Brown standing near a

12   shed in the back yard, and the juvenile that I had mentioned

13   earlier was back there with him.  The juvenile was holding a

14   backpack.  He handed the backpack to Mr. Brown.  Mr. Brown, in

15   turn, discarded it on the ground next to the shed.

16   Q.   Now, did that backpack -- when you-all noted the

17   juvenile earlier walking towards the house, did he have that

18   backpack with him?

19   A.   No, sir.

20   Q.   Okay.  So this backpack that y'all are observing is

21   essentially something new that was not brought into the house

22   by the juvenile, from what you-all witnessed?

23   A.   Yes, sir.

24   Q.   Okay.  And you indicated that after the juvenile --

25   after Mr. Brown got the backpack and set it down, what, if

1    anything, happened?

2        A.   The two began to walk quickly towards the -- I guess

3    the fence line, the back south or the west part of the yard.

4    Their mannerisms, their quick motions, it appeared they were

5    about to jump over the fence and flee.  At that point I yelled

6    to the both of them to stop and to come to me, and they both

7    complied.  They came to me and they were detained, and we

8    continued our investigation.

9        Q.   Okay.  Other than the agents that were with you and

10   Mr. Brown and the juvenile, were [sic] anyone else in the back

11   yard?

12       A.   In the back yard?

13       Q.   At this time -- at this point in time when you were --

14   when you told them to stop and approach you-all.

15       A.   No, sir.  Well, there was a Tuscaloosa police officer

16   with us, but none of us actually went into the back yard at

17   that point because there was a fence there.  We were kind of

18   stopped at the fence that kind of runs along the side of the

19   house.

20       Q.   And what kind of fence are we talking about?

21       A.   A chain-link fence.

22       Q.   Okay.  All right.  So nothing that really shelters

23   your point of view?

24       A.   No, sir.

25       Q.   Okay.  Now -- so, but other than law enforcement and

1  other than Mr. Brown and the juvenile, were there -- was there

2  anybody else in the back yard at that point in time?

3       A.   Not that we saw, no, sir.

4       Q.   Okay.  Once you had them approach y'all, what, if

5  anything, did y'all do?

6       A.   We detained them, began speaking with them.  Some of

7  the other ATF agents made contact with Mr. Brown's mother,

8  began explaining our reason for being there, and we continued

9  our investigation.

10      Q.   Okay.  At any point did any of the agents walk over

11 near the backpack?

12      A.   Yes.

13      Q.   Okay.  Do you have -- do you recall who those agents

14 were?

15      A.   It was Agent Chris Brantley and Agent John Pearson

16 (phonetic) with the ATF.

17      Q.   When they approached the backpack, what, if anything,

18 did they see?

19      A.   The backpack was -- based on my conversations with

20 them, the backpack was slightly open on the top.  They were

21 able to see into it and see that it contained -- there was a

22 container with what appeared to be a large amount of marijuana

23 in the back -- in the container.

24      Q.   Okay.  And you said the backpack was inside of the

25 shed?  Or where was it located?

1    A.   It was next to the shed on the -- I guess the opposite

2    side of the shed as the house -- or opposite side of the house

3    is -- if that makes any sense.

4    Q.   Okay.  So it was on the -- the shed was between the

5    house and the backpack?

6    A.   Yes, sir.

7    Q.   Okay.  And prior to continuing an investigation, did

8    anyone get permission from any of the homeowners to search?

9    A.   Yes, sir.  Agent Brantley and Agent Pearson spoke with

10   Mr. Brown's mother and obtained consent to search the shed and

11   the area around it.

12   Q.   Okay.  All right.  Do you recall what, if anything,

13   was found inside the backpack?

14   A.   Yes.  There was -- it was packaged in several

15   different ways, but --approximately 642 grams of marijuana.

16   There were four firearms in the bag and --

17   Q.   What types of firearms?

18   A.   There were two Glocks equipped -- two Glock pistols

19   equipped with the machine gun conversion devices, the

20   switches.  There was a third Glock that was not, and there was

21   a -- I believe it was a revolver.

22   Q.   Okay.  So out of the four firearms, two of them had

23   the machine gun conversion devices, or Glock switches, on

24   them?

25   A.   Yes.

1    Q.   And then the other firearm that was capable of having

2    one did not?

3    A.   Yes, sir.

4    Q.   And then you said that there was a revolver?

5    A.   Yes, sir.

6    Q.   Okay.  Do you recall if any of these firearms were

7    loaded?

8    A.   Right off, no, sir, I don't.

9    Q.   Okay.  Do you recall what, if anything, was found in

10   the shed right there by the two individuals?

11   A.   There was a fifth firearm found in the shed.  It was

12   what they call a Polymer80 firearm.  There was drug

13   paraphernalia found inside the shed and a couple of cell

14   phones, I believe.

15   Q.   Okay.  Now, were any examinations or tests done on any

16   of the firearms found in the backpack?

17   A.   Yes, sir.

18   Q.   Okay.  And what were those examinations or tests, that

19   you're aware of?

20   A.   They were -- the firearms were tested for their

21   functionality, as far as them being machine guns, with the ATF

22   firearms enforcement officer, and they were -- the shell

23   casings from the two firearms with the MCVs, the Glock

24   switches attached, the shell casings were entered into the

25   NIBIN system.

1    Q.   Okay.  Now, as far as the testing of the guns to

2  determine whether they were actually machine guns or not, do

3  you know if there was a successful test and if the guns were

4  determined to be machine guns?

5    A.   The -- the wording on the report is very lengthy, but

6  the devices themselves were determined to be machine guns.

7    Q.   Okay.  The Glock switch devices themselves?

8    A.   Yes, sir.

9    Q.   Okay.  Now, as far as -- you indicated that two of the

10  shell casings were sent to NIBIN.  Can you just briefly tell

11  us what NIBIN is or what it does?

12    A.   It's -- I'm not an expert on NIBIN, but it's the

13  National Integrated Ballistics Information Network.  It's a

14  national database that -- where the -- where ballistics

15  information derived from recovered evidence and also firearms

16  is entered to kind of give a national access to that

17  information.

18    Q.   Okay.  And as it relates to the two shell casings, did

19  you get any kind of report back as they're -- as it relates to

20  NIBIN?

21    A.   Yes, sir.  I guess somewhere around February 29th I

22  learned about a -- there was a -- what they call a NIBIN lead

23  generated from -- it's based off my conversation with the

24  gentleman who did the test -- a NIBIN lead was generated from

25  one of the firearms that was recovered that had the attached

 1   machine gun conversion device.

 2       Q.  And as, I guess, a NIBIN lead, is that something

 3   telling us that that gun either was or may have been, I guess,

 4   a participant in other criminal activity?

 5       A.  Yes, sir.  It's more -- I'm sorry.  It's more the may

 6   have been thing he said.  There's a lead which points you in a

 7   direction, and then once further microscopy is done, they can

 8   actually verify for sure.

 9       Q.  Okay.  And, of course, that would be done by some type

10   of toolmarks expert; correct?

11       A.  Yes, sir.

12       Q.  Do you have any information as to -- or any

13   information right now as to the crime that it related back to?

14       A.  Yes, sir.  It was a shooting.

15       Q.  Okay.  And do you know if that was the gun that was

16   found inside of the shed or one of the guns that were found

17   inside of the backpack?

18       A.  It was one of the ones that was in the backpack.

19       Q.  And the marijuana that was found in the backpack, was

20   it sent off for testing?

21       A.  It was, yes, sir.

22       Q.  And was there ever a result from it?

23       A.  Yes, sir.

24       Q.  Okay.  And what were the results?

25       A.  It was positive for marijuana.

1    Q.   Was there anything else either in the backpack or in

2    the shed that would be indicative of selling or distributing

3    marijuana?

4    A.   Yes, sir.  I believe I mentioned there was drug

5    paraphernalia found in the shed.  Specifically -- or more

6    specifically, there was a set of digital scales sitting in the

7    shed with a plastic cup on top of it.  It's a -- it's

8    something used very commonly by people who sell marijuana to

9    weigh their marijuana.  They'll put it in a cup or some other

10   type of container so that it isn't spilling out all over the

11   place because it's, you know, fine, it can be fine.  You put

12   it in the cup and weigh it in the cup versus letting it spill

13   everywhere.

14   Q.   And one final question.  As to when you-all initially

15   located Mr. Brown and the juvenile in the back yard, were they

16   near the shed when y'all initially saw them?

17   A.   Yes, sir.  Based off my conversation from one of the

18   agents that saw them, Mr. Hikes (phonetic) was standing -- or

19   excuse me -- the juvenile was standing near the open door of

20   the shed.  Mr. Brown was standing nearby.  The juvenile handed

21   the backpack to Mr. Brown.

22        MR. MCCOMB:  I have no further questions at this time,

23   Your Honor.

24        Your Honor, may I ask just one more question?

25        THE COURT:  You may.

1    Q.   (By Mr. McComb)  The individual that you are referring

2    to as Mr. Brown and that you-all saw in the back yard, is he

3    in court today?

4    A.   Yes.

5    Q.   Can you point him out and tell the Court what he's

6    wearing?

7    A.   Yes, sir.  He's at the table right there wearing the

8    red clothing.

9         MR. MCCOMB:  Okay.  May the record reflect that the

10   witness has identified the defendant.

11        THE COURT:  It will reflect.

12                       CROSS-EXAMINATION

13   BY MS. ROBERTSON:

14   Q.   Good morning, Officer Olvey.

15   A.   How are you?

16   Q.   I am well.

17        Officer Olvey, did you testify before the grand jury

18   regarding this incident?

19   A.   Yes, sir.  Or excuse me.  Yes, ma'am.

20        MS. ROBINSON:  All right.  Your Honor, we would make a

21   Jenks demand for the transcript of that testimony at this

22   time.

23        THE COURT:  Sounds like they don't have it yet.

24        MR. MCCOMB:  We don't have it yet, Your Honor.

25        MS. ROBERTSON:  Your Honor, we'll proceed forward

1   today, but we're entitled to it at the time that he testifies

2   and would expect to receive it in short order and will bring

3   it to the Court's attention if anything is relevant to what is

4   testified to today.

5           THE COURT:  Hang on one second.

6           Continue.

7       Q.  (By Ms. Robinson)  Officer, you didn't have a warrant

8   for Mr. Brown's arrest on November 7th?

9       A.  No, ma'am.

10      Q.  And you didn't have a warrant to search the house on

11  November 7th?

12      A.  No, ma'am.

13      Q.  And you didn't have a warrant to search the back yard

14  on November 7th?

15      A.  No, ma'am.

16      Q.  And you didn't have a warrant to search the shed on

17  November 7th?

18      A.  No, ma'am.

19      Q.  Okay.  So let's talk a little bit about the layout of

20  this residence.  I believe you referred to being on the west

21  side of the house, but let's just talk about staring at the

22  house as if you're standing on the street looking at the front

23  of the building.  So if you're looking at the residence, you

24  referred to a carport.  That carport is on the left side of

25  the house; correct?

1    A.   Yes.

2    Q.   And the yard that you're describing standing in

3 looking into the back yard, that's on the right side of the

4 house; correct?

5    A.   The yard is behind the house --

6    Q.   Uh-huh.

7    A.   -- the back yard.

8    Q.   The back yard.  But you said you went and you were

9 going towards the back yard and you couldn't go any further

10 because there was a fence that obstructed the route.

11    A.   Yes.

12    Q.   That's on the right side of the house; correct?

13    A.   Yes.

14    Q.   And the house has a front door?

15    A.   Yes.

16    Q.   You didn't go to the front door to go into the back

17 yard?

18    A.   No, ma'am.

19    Q.   No.  You didn't -- and this yard that is on the right

20 side of the house, that is not the route that the postman

21 would take if he were arriving at the house with a package?

22    A.   No, ma'am.

23    Q.   No.  He would go to the front door; right?

24    A.   I can't speak for him, but most likely.

25    Q.   There's not a door -- there's not a -- where you were

1    standing on the right side of the house by that fence, there

2    was no door into the house at that location; correct?

3        A.   I don't believe so.

4        Q.   Okay.   There is a door into the house that's inside of

5    the carport; correct?

6        A.   Yes.

7        Q.   And then there's the front door?

8        A.   Yes.

9        Q.   But you were not at either of those locations?

10       A.   No.

11       Q.   You were standing in the yard on the right side of the

12   house looking into the back yard?

13       A.   Yes.

14       Q.   And you did not have a warrant to be in that position?

15       A.   No, ma'am.

16       Q.   Okay.   Now, you spoke about Mr. Brown coming to your

17   attention in October of 2023.   He was not charged with

18   anything related to that incident?

19       A.   No, ma'am.

20       Q.   No arrest warrant was obtained for him based on that

21   incident?

22       A.   No, ma'am.

23       Q.   No one went and tried to get a search warrant for the

24   residence based on the incident?

25       A.   No, ma'am.

1    Q.   Okay.  So y'all just set up surveillance at the house;

2   right?

3    A.   Yes, ma'am.

4    Q.   You mentioned there was a juvenile in the back yard

5   who had a firearm on his person.

6    A.   Yes.

7    Q.   Can you tell me which of these firearms was the one

8   that was on the juvenile?

9    A.   I don't know.

10   Q.   Okay.  Do you know -- what color was that gun?

11   A.   I don't know.

12   Q.   What size was that gun?

13   A.   I don't know.

14   Q.   Where on his person was it?

15   A.   In his waistband.

16   Q.   In his waistband.  What was he dressed in that day?

17   A.   I don't recall.

18   Q.   So this is November.  Was he wearing a jacket?

19   A.   I didn't initially see him when he walked to the

20   residence.  I was a few blocks away in a different position.

21   Q.   Who saw him?

22   A.   It would have been Agent Brantley and a couple of

23   other ATF personnel.

24   Q.   Did they memorialize anywhere what he was wearing?

25   A.   Not to my knowledge.

1     Q.  Did you have a pole cam set up to observe the back

2  yard?

3     A.  No, ma'am.

4     Q.  Did you have a pole cam set up anywhere to observe the

5  residence?

6     A.  No, ma'am.

7     Q.  How many officers were there that day?

8     A.  Would have been five or six.

9     Q.  Okay.  And so when you approached the house and

10  someone was speaking with his mother and people were on the

11  side of the building, how many officers or anyone affiliated

12  with law enforcement was on the premises at that time?

13     A.  It would have been five or six.

14     Q.  How many vehicles were near the property at that time?

15     A.  Should have been three.

16     Q.  Okay.  So you said that you went to the side of the

17  house and you're standing in the side yard looking over the

18  fence into the back yard.  Is that the point at which you

19  could see the shed?

20     A.  I didn't -- I personally didn't observe the shed.  I

21  didn't make it far enough into the -- I didn't get close

22  enough to the fence to have actually observed the back yard.

23  The other two agents, Agent Joel Smith and John Pearson,

24  approached the fence before I did.

25     Q.  Uh-huh.

1     A.   And at that point Agent Pearson indicated that he was

2  -- he was watching them and --

3     Q.   Okay.  And, so, to be clear, you could not see into

4  the back yard until you were standing on the side of the

5  house?

6     A.   No.

7     Q.   Okay.  And -- nor see into the shed until you were

8  standing on the side of the house?

9     A.   No.

10     Q.   Okay.  So I believe that you testified that -- and

11  let's -- and you also didn't have a warrant for the juvenile?

12     A.   No.

13     Q.   You didn't have a warrant for anyone on the premises?

14     A.   No, ma'am.

15     Q.   Okay.  So you instruct Mr. Brown and the juvenile to

16  come over to you, to basically walk towards the law

17  enforcement that are standing in the side yard?

18     A.   Yes.

19     Q.   Okay.  And then you put handcuffs on them?

20     A.   Yes.

21     Q.   And then you called the juvenile's mother -- or

22  guardian?

23     A.   We did not speak with her, to my knowledge.  I didn't.

24  Someone else may have.

25     Q.   Now, you testified that you identified this individual

1    as a juvenile, armed juvenile, walking into the back yard.  So

2    you knew when you saw this individual walk into the back yard

3    that this was a juvenile?

4        A.  No.

5        Q.  So at the time that he went into the back yard, you

6    just knew it was an individual that had a firearm in his

7    waistband?

8        A.  This -- this was an evolving situation.  At the time,

9    I didn't know it was a juvenile.  I just knew it was a

10   gentleman that approached the house from a residence up the

11   street who had a firearm in his waistband.  Over the next

12   several minutes, it was determined that he had just gotten off

13   the school bus -- or I was made aware that he had just gotten

14   off a school bus, which indicated he was a juvenile, plus

15   through speaking with him for a few moments, I learned he was

16   a juvenile.

17       Q.  So did you or any other officer on the scene know he

18   was a juvenile before he was placed in handcuffs?

19       A.  The fact that he got off a school bus was a strong

20   indicator, but, I mean, an 18-year-old can still be in school.

21   Just -- other than that, no.

22       Q.  And is it lawful in the state of Alabama for an

23   18-year-old to have a firearm?

24       A.  No.

25       Q.  No?

1    A.  Oh, actually, yes.

2    Q.  Yes.  So an 18-year-old can have a firearm in the

3  state of Alabama --

4    A.  Yes.

5    Q.  -- correct?  And no longer needs a permit to carry or

6  anything along those lines?

7    A.  No.

8    Q.  And that was the case in November?

9    A.  Yes.

10    Q.  Okay.  And so I believe you said that Mr. Brown and

11  this juvenile were both fully compliant when they were ordered

12  to come over and speak to law enforcement?

13    A.  Yes.

14    Q.  And then they were placed in handcuffs?

15    A.  Yes.

16    Q.  And they were sat on the front porch?

17    A.  Yes.

18    Q.  And then you and your colleagues began speaking with

19  them?

20    A.  Yes.

21    Q.  And they were read Miranda?

22    A.  They were, yes, ma'am.

23    Q.  Okay.  So they were advised that they didn't have to

24  talk to you?

25    A.  Yes.

1      Q.   And that they could have an attorney present?

2      A.   Yes.

3      Q.   And you don't remember at any point the juvenile's

4  mother being called or some guardian being called?

5      A.   I don't.  I didn't call her.  I'm not aware of her

6  being called.

7      Q.   Okay.  Did everyone cease trying to talk to this

8  juvenile when they realized that he was under age and did not

9  have a guardian present?

10     A.   No, he has the right to request a guardian.

11     Q.   Uh-huh.  Did you tell him that?

12     A.   That's part of our juvenile Miranda.

13     Q.   Okay.  So did you give him juvenile Miranda?

14     A.   Specifically, I can look at my report.  I don't

15  remember if I'm the one that read it or if someone else did.

16     Q.   Do you remember giving this individual juvenile

17  Miranda?

18     A.   I don't remember giving him, specifically me, no.

19     Q.   Do you remember one of your colleagues giving him

20  juvenile Miranda?

21     A.   No.

22     Q.   Okay.  So you have Mr. Brown and this juvenile

23  handcuffed, sitting on the side porch; right?

24     A.   Yes.

25     Q.   And this is after, it sounds like, two or more

1    officers have gone up into the yard on the side of the house

2    away from any natural approach or egress from the house;

3    correct?

4         A.   Yes, ma'am.

5         Q.   We're all clustered in the side yard?

6         A.   Say that one more time.  I'm sorry.

7         Q.   You've got two more officers who have walked onto the

8    property, no warrant, and are standing on the side of the

9    house in the yard?

10        A.   Yes, ma'am.

11        Q.   Nowhere near the front door?

12        A.   Yes.

13        Q.   Nowhere near the door that's in the carport?

14        A.   Yes, ma'am.

15        Q.   Clear on the other side of the house from the carport?

16        A.   Yes, ma'am.

17        Q.   Okay.  So these two individuals are sitting cuffed on

18   the front porch.  Is that at the point at which you asked

19   Mr. Brown's mother for consent to look into the back yard?

20        A.   I didn't personally ask.  It was either Agent Pearson

21   or Agent Brantley.

22        Q.   But that occurred after these two individuals are

23   handcuffed on the front porch?

24        A.   Yes, ma'am.  They were handcuffed pretty quickly.

25        Q.   And was -- and Mr. Brown's mother was told, I presume,

 1    that you would go and get a warrant if she did not cooperate?

 2        A.   I'm unsure how that conversation -- I wasn't present

 3    when they spoke with her.

 4        Q.   Okay.  But they told you, We have permission to go

 5    into the back yard?

 6        A.   Through our conversation, that's what I learned.  Like

 7    I said, I wasn't present.

 8        Q.   So who was it that got this permission?

 9        A.   It would have either been Agent Brantley or Agent

10    Pearson.

11        Q.   Okay.  And did they -- did Mr. Brown's mother

12    accompany them into the back yard?

13        A.   Yes.

14        Q.   Was she permitted to watch everything that they were

15    doing?

16        A.   I wasn't back there, so I don't --

17        Q.   So you didn't actually participate in the search?

18        A.   No, ma'am.

19        Q.   So you can't speak to the presence of the backpack or

20    whether -- you didn't see whether the backpack was open?

21        A.   No, ma'am.  That was all basically my conversations

22    with Agent Brantley and Agent Pearson.

23        Q.   Okay.  And we've talked a lot about marijuana, but

24    we're -- that is the drug of concern in this case; correct?

25        A.   Yes.

1    Q.  You talked about the shell casings that were sent to

2  NIBIN; correct?

3    A.  Yes.

4    Q.  Okay.  So we don't know whether those shell casings

5  were -- we don't know whether those shell casings came from

6  the gun that had been on the juvenile?

7    A.  I do not know, no, ma'am.

8    Q.  Okay.  Because we don't know which gun the juvenile

9  had?

10    A.  No, ma'am, we don't know.

11    Q.  Were fingerprints recovered from the shell casings?

12    A.  No, ma'am.

13    Q.  When did that shooting occur?

14    A.  That was April of last year.

15    Q.  April of 2023?

16    A.  Yes, ma'am.

17    Q.  Do you know whether the firearms were fingerprinted?

18    A.  I can check.  I don't recall in this specific case.

19  They were not, to my knowledge.

20    Q.  Okay.  Now, you're the lead agent on this

21  investigation?

22    A.  Yes, ma'am.

23    Q.  So you're aware that Mr. Brown was approached with a

24  target letter?

25    A.  He was not specifically.

1    Q.  You're aware that a target letter was prepared for

2    Mr. Brown?

3    A.  Yes, ma'am.

4    Q.  And that it was given to his mother?

5    A.  Yes, ma'am.

6    Q.  Are you the agent that gave it to his mother?

7    A.  I am, yes, ma'am.

8    Q.  Okay.  And you told his mother that the ATF was hoping

9    to -- or some agency was hoping to speak with her son?

10   A.  Yes.

11   Q.  And that was -- you were -- so you were fully aware

12   that this case was being approached as a target case as of

13   January of this year?

14   A.  After having not heard anything from Mr. Brown, that

15   was off our table.

16   Q.  Okay.  But you're aware that Mr. Brown had the right

17   not to say anything; right?

18   A.  Yes.

19   Q.  And you're aware that he had the right to decide

20   whether to talk with the advice of counsel; right?

21   A.  Yes.

22   Q.  And after the target letter was received, the

23   paperwork was actually submitted seeking appointment of

24   counsel; right?

25   A.  I wasn't aware of any of that, no, ma'am.

1    Q.  So you did not know that counsel had been appointed to

2    Mr. Brown?

3    A.  I don't believe so.

4    Q.  So no one notified you that the financial paperwork

5    had been submitted to the Court and that counsel had been

6    appointed to Mr. Brown?

7    A.  Not that I recall.  I don't -- if I was made aware of

8    that, it was through some passing conversation.  It's not

9    anything that I -- that I noted.

10   Q.  Okay.  So -- but you delivered the target letter to

11   Mr. Brown's mother?

12   A.  Yes.

13   Q.  On the hope that Mr. Brown would cooperate and sit

14   down and talk with law enforcement?

15   A.  Yes, ma'am.

16   Q.  And you knew that that letter was accompanied by a

17   financial affidavit that could be completed, submitted to the

18   Court for the appointment of counsel?

19   A.  Yes.

20   Q.  But you did nothing to follow up to determine whether

21   counsel had been appointed or whether there was any

22   opportunity to sit down and speak with Mr. Brown?

23   A.  Once I delivered the target letter, it was just kind

24   of like a waiting game, just wait until you hear from the

25   prosecutor's office or your office.  I heard nothing from

1    either.

2       Q.  Okay.  But you also didn't ask; right?

3       A.  I think we had some conversations about it.  Hadn't --

4    I don't -- I don't recall how they went, but --

5       Q.  Okay.  But you don't recall, during those

6    conversations, it being noted that counsel had been appointed?

7       A.  I don't recall being told that specifically, no.

8          MS. ROBERTSON:  Your Honor, if I could have one

9    moment.

10      Q.  (By Ms. Robinson)  Actually one -- last couple

11   questions, Officer.  Were you present when Mr. Brown was

12   arrested last week?

13      A.  Yes.

14      Q.  And so it's my -- am I correct that law enforcement

15   approached the same house where he -- this investigation had

16   played out back in November?

17      A.  Yes, ma'am.

18      Q.  And he was ordered to come out?

19      A.  Yes, ma'am.

20      Q.  And he complied with that instruction?

21      A.  He did, yes, ma'am.

22      Q.  He didn't try to run?

23      A.  No, ma'am.

24      Q.  He was taken into custody without incident?

25      A.  Yes, ma'am.

1          MS. ROBINSON:  Okay.  Your Honor, no further

2    questions.

3          MR. MCCOMB:  I just have some follow-up questions,

4    Your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. MCCOMB:

7     Q.  And this is in relation to the guns that were found in

8    the backpack.  Do you recall if there was any of the firearms

9    with distinctive markings or coloring in the backpack?

10     A.  Yes.

11     Q.  Okay.  Can you tell me a little bit about that?

12     A.  In the backpack there were three Glock pistols.  One

13   had a brown or goldish-colored slide at the top part of the

14   firearm, and there was a -- one with some blue accents to it.

15   I don't know if it was paint or something but it had some blue

16   coloring on it.

17     Q.  Okay.  And in the course of your investigation, did

18   you review either photographs from an electronic device or

19   from a social media device -- or from social media?

20     A.  Yes.

21     Q.  And in reviewing those photographs, did you come

22   across Sebastian Brown --

23     A.  Yes.

24     Q.  -- in any of those photographs or videos?

25     A.  Yes.

1    Q.  Okay.  Can you tell us a little bit about those?

2    A.  Yes.  In those -- there was a photograph of several

3 individuals holding firearms that were equipped with Glock

4 switches, or machine gun conversion devices.  Brown was one of

5 those individuals.  One of the firearms that he was holding

6 was similar to one of the ones that were recovered from the

7 backpack.

8    Q.  What do you mean when you say "similar"?  How was it

9 similar?

10   A.  Sir?

11   Q.  How was it similar?

12   A.  They looked the same, but this is a photograph.  I

13 can't say it's the same one.

14   Q.  Do you recall if this was the one with the brown/tan

15 slide that you indicated or the blue pistol, or do you

16 remember right offhand?

17   A.  I don't remember right offhand.

18   Q.  Okay.  But in that photograph that you're referring

19 to, does -- do the weapons that he's holding -- do they

20 contain machine gun conversion devices?

21   A.  Yes.

22   Q.  Okay.  Is that the only photograph that you have of

23 Mr. Brown holding a machine gun conversion device?

24   A.  There was more than one.  There was -- there was a

25 couple of videos also.

1      Q.  Okay.

2      A.  It's the only photograph I recall.

3      Q.  Okay.  Were the videos -- are they showing

4   substantially the same thing?

5      A.  Yes.

6      Q.  You indicated, as far as the fence and what you could

7   see -- did any of the agents -- either you or the agents there

8   climb over the fence before y'all were given permission to

9   climb over the fence?

10     A.  I didn't.  I don't know that anyone -- I don't believe

11   anyone else did.  It was -- I yelled at them to come towards

12   us.  I didn't want to go over the fence.

13          MR. MCCOMB:  I have no other questions, Your Honor.

14          THE COURT:  Miss Robertson?

15                      RECROSS-EXAMINATION

16   BY MS. ROBERTSON:

17     Q.  The social media material that you were just referring

18   to, when were those images taken?

19     A.  I don't know the exact dates.

20     Q.  When were they posted?

21     A.  I don't have that information in front of me.

22     Q.  When did you see them?

23     A.  I saw them in -- would have been late November -- or

24   excuse me -- late October of last year.

25     Q.  On whose page?

 1     A.   A gentleman by the name of Markeias Thompson.

 2          MS. ROBERTSON:  No further questions, Your Honor.

 3          THE COURT:  Thank you.

 4          Mr. McCombs?

 5          MR. MCCOMB:  No, nothing further, Your Honor.

 6          THE COURT:  You may step down, sir.

 7          Mr. McCombs, more evidence or just argument?

 8          MR. MCCOMB:  Just arguments, Your Honor.

 9          THE COURT:  Let's take a two-minute break before

10    argument.  We'll be in recess.  Off the record.

11          (Recess taken from 11:17 a.m. to 11:25 a.m.)

12          THE COURT:  Let's go back on.  Mr. McCombs, let's stay

13    with you for argument.  Miss Robertson has given me a lot to

14    think about, given you a lot to think about.  But bring us

15    back to risk of danger.  As we've said, I don't think we're on

16    risk of flight.

17          MR. MCCOMB:  Yes, Your Honor.  Specifically as to the

18    risk of danger, as you've heard Detective, or Investigator,

19    Olvey testify to, that there has been at least two different

20    interactions with law enforcement with this individual, with

21    Mr. Brown, in the October-November time frame of 2023.  In one

22    of those interactions officers were approaching his home

23    simply to ask him or to interview him as a witness in a

24    shooting and he ends up running out the back door with an AR

25    rifle.  He is caught with that rifle.  The rifle is recovered.

1    It is from a prior criminal investigation as regards to -- it

2    was somehow bought under false pretenses by certain other

3    individuals.  But it also came back to a prior shooting, that

4    particular rifle that was in his hands.

5         And in this situation in November of 2023, he is in

6    constructive possession of four more handguns, two of which

7    have machine gun conversion devices, one of which comes back

8    to yet another shooting.  Now -- and this is all firearms that

9    were possessed or constructively possessed by Mr. Brown, and

10   all activity seemingly that he is aware of and possibly, the

11   inference would be, participating in.  So that in and of

12   itself begs the question of his danger to the community, being

13   found in possession of at least five guns on two separate

14   occasions, and that's not counting the pistol that was in the

15   shed that we do not attribute to Mr. Brown in our charging.

16        We are -- the Government is certainly worried that if

17   Mr. Brown is allowed to go to live -- reside with his sister

18   that for much of the day -- she's obviously a very hard worker

19   and she's not going to be in the home for much of the day and

20   there's going to be very little supervision on Mr. Brown and

21   on, frankly, his travels.  There's very little impediment to

22   his ability to travel, that we've -- from what we gather.

23        THE COURT:  What about electronic monitoring on that?

24        MR. MCCOMB:  Electronic monitoring -- if released,

25   electronic monitoring would be great, but he only has to break

1    it one time to return back to Tuscaloosa before -- and maybe

2    acquire or reacquire any set of firearms and be involved in

3    any activity back in his home in the city of Tuscaloosa.  You

4    know, we'll get notice that he broke his curfew but that'll be

5    the end of it.  And the Government is worried, frankly, about

6    his ability to reacquire firearms from individuals and friends

7    in Tuscaloosa and his ability to travel.

8         And just as an aside, Your Honor, when the ATF

9    requested that a target letter be sent and was sent, you know,

10   based on my conversations with Miss Robertson and his defense

11   counsel, they didn't find him.  They had no idea where he was

12   and they were still looking.  My last conversation with them

13   was, you know, several weeks before the indictment that he was

14   yet unfound, so the assumption was that he was not

15   cooperating.  The assumption was that -- you know, that he did

16   not want to cooperate, so we moved forward with an indictment

17   without knowing or being told that there was any kind of

18   communication between his defense counsel and himself in

19   regards to any possible cooperation.

20        THE COURT:  Well, Miss Robertson tells a very

21   different story.

22        MR. MCCOMB:  Yeah.  But the story -- the only story I

23   have is that if she had been speaking with him, that was news

24   to us before the indictment, okay?  We had no idea that he was

25   found and spoken with by defense counsel.  I do not doubt that

1    that was happening, certainly, but we had no knowledge of

2    that, none, neither myself, my office, or the ATF agents that

3    were involved in the case, which is why the indictment was

4    moved forward with.

5         But going back to just basically his danger, Your

6    Honor, again, just to reiterate, he does have some prior

7    adjudications that has been discussed previously, and

8    regardless of those adjudications, and like his sister has

9    testified on the stand, even served some time.  And regardless

10   of that, he is still possessing a fairly large quantity of

11   firearms for an 18-, 19-year-old man, particularly when those

12   firearms always seem to come back to a dangerous encounter, a

13   shooting or something of that nature.  And I think it's

14   because of that I don't think there's any way we can

15   reasonably -- reasonably entertain the safety of the community

16   unless he is held pretrial.

17        THE COURT:  You say always comes back to an incident.

18   Two of five.

19        MR. MCCOMB:  Two of the five, that's correct.

20        THE COURT:  Or a lead on two of the five?

21        MR. MCCOMB:  That's correct.

22        THE COURT:  Thank you.

23        Miss Robertson?

24        MS. ROBERTSON:  Your Honor, just --

25        THE COURT:  Mr. McCombs, do you have something to add?

1   Or I can come back to you.

2   MR. MCCOMB:  I just wanted to clarify, the agent just

3   clarified for me there was only a NIIBIN lead on one and that

4   was one of the firearms found in the backpack.  The AR was

5   just found to be related to an earlier shooting, as far as we

6   are aware of.

7   THE COURT:  Thank you.

8   Sorry, Miss Robertson.  Go ahead.

9   MS. ROBERTSON:  Yes.  Sorry, Your Honor.  I didn't

10  mean to speak over you.

11  As regards -- in regards to those allegations, Your

12  Honor, it sounds like one of those shootings took place in

13  April -- I'm not going to -- seven months -- math on my feet

14  is not my skill -- but, Your Honor, sometime before it was

15  recovered from Mr. Brown's property, and I believe the

16  testimony was that there would need to be some follow-up

17  ballistic work done.  So in the incident regarding the AR, I

18  don't know that the temporal relation between the recovery of

19  the gun and the allegations -- there's a lot -- I think we're

20  being asked to do a lot of connecting the dots here in a

21  situation where I certainly don't have that paperwork and

22  can't speak to it, Your Honor, but if we were in front of a

23  jury, I would have -- take issue with a lot of the speculation

24  on that front.

25  Your Honor, to be clear, my office, I, Mr. Brown take

1    no issue with how the case was pursued.  As I said before, it

2    is certainly within the Government's, you know, prerogative to

3    go ahead and indict a defendant at any time.  They were under

4    no obligation to follow up with my office, and I certainly

5    know that on any future target letter I have with Mr. McComb,

6    I will be more proactive with my conversation with him and

7    with my client.  I've looked back over my file and not that,

8    you know, our -- I believe my first communication with

9    Mr. McComb was back in mid-January when I said, Hey, I'm going

10   to be taking this case; you know, any discovery you can

11   provide, any information?  I was in touch -- my office was in

12   touch with Mr. Brown's mother.  Less than a week later I had

13   my first phone call and meeting with him in late January.  So

14   at no point in time do I recall saying I can't find him.  I

15   had been quite successful in finding him and sitting down and

16   meeting with him and traveling to Tuscaloosa to do so.

17   Because I was not under the impression that there was any time

18   pressure and because I hadn't received discovery and needed to

19   do my due diligence in trying to get some idea how the case

20   might proceed, it was simply taking my office more time.  I

21   mean, if I get something in mid-January, I understand their

22   right to indict at the end of February, but I wasn't in a

23   position to return to the Government because our investigation

24   was ongoing to decide and advise Mr. Brown about the best

25   course.

 1          All to say, Your Honor, from at least mid-January,

 2   Mr. Brown has been well aware that the feds were investigating

 3   him.  The target letter spells out quite clearly that he is

 4   the target of a federal investigation and potentially could be

 5   charged federally.  I appreciate the Court's finding that

 6   flight is not an issue here but, Your Honor, the Government

 7   saw fit and the agent saw fit to approach Mr. Brown on a

 8   target letter knowing that he was taken -- knowing about what

 9   happened in October, knowing about what happened in November.

10   If they saw him as being such a huge danger at that time, they

11   could have indicted him sooner or brought him in on a

12   complaint and, rather, they approached him with a target

13   letter which went a step further than just letting an

14   individual remain in the community while an investigation

15   plays out and while ballistics testing is done or marijuana

16   testing is done.  And I know you can only bring the case to

17   the grand jury once you have sufficient evidence.  Oftentimes

18   that happens and an individual stays in the community and the

19   Government comes in and says, Well, we think they're dangerous

20   or there may be a risk of flight now because now they're aware

21   of these charges.  Mr. Brown has been aware of this potential

22   exposure since January, since his mother received that target

23   letter.  And if he was that much -- if he is such a

24   sufficiently dangerous person now, you know, presumably that

25   would have also been the case in January when they elected to

1    go and try to approach him in that way.

2           Your Honor, we have proposed that Mr. Brown reside in

3    a different county with a different family member.  Any

4    defendant can cut off electronic home monitoring, but Mr.

5    Brown has been compliant with law enforcement.  He was

6    compliant in November when they instructed him to walk over

7    and sit handcuffed while that search was underway.  He was

8    compliant when he received a target letter and has been

9    communicating with my office.  He was compliant when they

10   showed up last week and ordered him to come out and to be

11   arrested on this indictment.  He has demonstrated compliance

12   with court order.

13          There's nothing in the pretrial services report to

14   suggest that he has failed in his obligations to the state

15   court, and he has been on state -- it appears he's been on

16   bond in the state since November of last year.  He was

17   released on bond on November 8th in 2023.  There is no

18   suggestion that in the time that has lapsed since then that he

19   has violated the state court bond or that he failed to appear.

20          So, Your Honor, I simply think that the suggestion

21   that we need to worry about Mr. Brown cutting off an ankle

22   monitor, getting ahold of a car to drive to Tuscaloosa to

23   somehow get ahold of a gun is just too speculative to warrant

24   detaining him at this time when we have a proposed residence

25   with a suitable third-party custodian in a different county

1    where Mr. Brown has been thus far compliant with everything

2    that's been presented to him.

3         And while I understand that these charges are very

4    serious and that they -- that there are concerns here, I think

5    that those concerns are addressed by the appointment of a

6    third-party custodian who has already said that she'll be

7    trying to get Mr. Brown a job.  And so the idea that he's

8    going to be sitting at home twiddling his hot thumbs is not a

9    certain outcome, but we have a third-party custodian and a

10   proposal for electronic home monitoring.  And those are, in

11   fact, greater restrictions than he's been subjected to on the

12   state court bond and should go a long way to ensure the Court

13   that he will abide by the Court's directives and follow any

14   conditions that are placed upon him if released on bond, Your

15   Honor.

16        THE COURT:  Thank you.

17        Mr. McComb -- and I apologize if I said "McCombs"

18   before.  Mr. McComb, again, Miss Robertson makes a lot of good

19   points and makes a really good case for release.  So why isn't

20   all of that enough for reasonable assurance:  different

21   county, third-party custodian, electronic monitoring, curfew,

22   home detention, and so forth?  Because we've been through the

23   charges and the statutory presumption and we have the separate

24   incident.  We have the connections to the crimes.  And so I

25   hear a lot of what you're saying, but help me see it all the

1    way.

2        MR. MCCOMB:  My last concern is simply with the

3    third-party custodian and with putting him as a named

4    individual on the lease, you know.  We're not even sure that

5    that's going to be able to be done.  There's been nothing

6    presented to the Court that that can be done or will be done.

7    And I think the probation office has supplied the Court and

8    defense counsel and myself with a notation essentially saying

9    that a background check must be run or will be run by that

10   apartment or that's their general practice.  And we've been

11   given no assurances that he will be able to be there, be

12   present there.  And I think, absent that, I still have some

13   hard questions as to whether he can be released, because, you

14   know, I know his sister wants to take him, but she is in a

15   situation where, one, she cannot provide much supervision to

16   him, and two, that we're not certain that the apartment

17   complex will accept him.  And I think that's an important fact

18   that we need to ascertain before we can move any further as

19   far as his release to that complex.

20       THE COURT:  Well, and the law says the proposal, the

21   bond proposal, isn't supposed to be heroic and it's pretty

22   close to heroic now.  I articulated my concern or -- concern

23   about what all has been happening since November.  And

24   Mr. Brown hasn't been working since November.  I'm trying to

25   figure out how to square what release would look like with the

 1    bond proposal and the safety concern.

 2          That was some thinking out loud.  I didn't mean to

 3    interrupt you.

 4          MR. MCCOMB:  No, no.  I was finished.  I was just

 5    listening, Your Honor.

 6          MS. ROBERTSON:  Your Honor, our proposal would be that

 7    the Court address this similar to how we deal with release to

 8    a drug treatment facility where he would not be released

 9    unless and until there is proof provided to the probation

10    office that he has been added to the lease and he is lawfully

11    allowed to reside at the residence.

12          THE COURT:  Right, right.

13          Anything else?

14          MR. MCCOMB:  Nothing else.

15          THE COURT:  Well, Miss Robertson, as I said, I think

16    you make a lot of good points.  And if you can get in the

17    record that he would be accepted on the lease, I think that's

18    worth doing.  Based on the concerns I've articulated, I think

19    there's just too much in light of the -- what I would call the

20    heroic bond proposal.

21          So, Mr. Brown, I'm ordering detention.  You will be

22    remanded to the custody of the U.S. Marshal.  I find the

23    Government has carried its burden to establish risk of danger.

24          Mr. McComb, anything else for today?

25          MR. MCCOMB:  Nothing from the Government, Your Honor.

1          THE COURT:  Miss Robertson?

2          MS. ROBERTSON:  Your Honor, just to be clear, I just

3     want to make sure I understand the Court's first comment

4     before the Court ordered Mr. Brown detained.  Were we to

5     determine that he could reside at that residence, would the

6     Court just ask that we submit that, or are you --

7          THE COURT:  I would suggest you do that just to

8     complete your record.  I'm not suggesting that it would change

9     the determination right now, but I would -- if you can get

10    that, I think that would be worth completing the record on.

11         MS. ROBERTSON:  Okay.

12         THE COURT:  We're adjourned for today.

13         (Adjourned accordingly at 11:42 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5                          Dated:  April 9, 2024

6

7

8    *Pamela G. Weyant*
     ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
     Pamela G. Weyant, RDR, CRR, CCR
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25